UNITED STATES FIRE INSURANCE COMPANY and Westchester Fire Insurance Company, Plaintiffs-Appellants-Cross-Respondents,†

v.

GOOD HUMOR CORPORATION, as successor to Gold Bond Ice Cream, Inc., Defendant-Respondent-Cross-Appellant. [Case No. 92–0642.]

UNITED STATES FIRE INSURANCE COMPANY, Plaintiff-Appellant,†

v.

GOOD HUMOR CORPORATION, as successor to Gold Bond Ice Cream, Inc., Defendant-Respondent. [Case No. 92–2318.]

Court of Appeals

*Nos. 92–0642, 92–2318. Oral argument December 15, 1992.—Decided January 20, 1993.*

(Also reported in — N.W.2d —.)

† Petition to review denied.
† Petition to review denied.

810

811

On behalf of the plaintiff-appellant, United States Fire Insurance Company, the cause was submitted on the briefs of *John M. Swietlik* and *Vicki L. Arrowood* and oral argument of *John M. Swietlik* of *Kasdorf, Lewis & Swietlik, S.C.* of Milwaukee.

On behalf of the plaintiffs-appellants-cross-respondents, United States Fire Insurance Company and West-

chester Fire Insurance Company, the cause was submitted on the briefs of *John M. Swietlik* and *Patti J. Kurth* and oral argument of *John M. Swietlik* of *Kasdorf, Lewis & Swietlik, S.C.* of Milwaukee.

On behalf of the defendant-respondent and the defendant-respondent-cross-appellant, Good Humor Corporation, the cause was submitted on the briefs of *Joseph M. Nicks* and *Michael B. Apfeld* and oral argument by *Joseph N. Nicks* of *Godfrey & Kahn, S.C.* of Green Bay.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   United States Fire Insurance Company and Westchester Fire Insurance Company appeal part of a summary judgment holding that they breached their duty to defend Gold Bond Ice Cream, Inc., and an order denying relief from that judgment. The insurers assert that (1) because several exclusions eliminated their duty to indemnify Gold Bond, they had no duty to defend; (2) the circuit court wrongfully dismissed their declaratory judgment action; and (3) the circuit court wrongfully refused to grant their sec. 806.07, Stats., motion. Good Humor Corporation, as successor to Gold Bond, cross-appeals that part of the summary judgment limiting the insurers' liability to the policy limits, and denying Gold Bond prejudgment interest and attorney fees.

We conclude that the insurers had a duty to defend Gold Bond and breached that duty, and that Gold Bond is entitled to the policy limits and attorney fees incurred in both defending the underlying action and proving coverage. Because the settlement amount and the costs incurred in defending the underlying action are readily determinable, Gold Bond is entitled to 5% interest on

both amounts from the date of Gold Bond's counterclaim. However, Gold Bond is not entitled to prejudgment interest at 12% under sec. 628.46, Stats. Therefore, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL BACKGROUND

On September 10, 1987, Carnation Company sued Gold Bond in federal court in California. In its complaint, Carnation claimed in excess of $24 million in damages caused by contaminated ice cream it purchased from Gold Bond. The business agreement between Carnation and Gold Bond called for Gold Bond to manufacture bite-sized nuggets of ice cream known as "Bon-Bons" for Carnation, using machinery and related equipment owned by Carnation.[1] Carnation agreed to supply all packaging materials.

During July 1987, the United States Food and Drug Administration disclosed that certain Carnation items Gold Bond manufactured on March 11, 1987, tested positive for listeria monocytogenes. The FDA recommended a recall of all Bon-Bons and Fruit Scoops manufactured between November 1986 and June 1987. Carnation ordered the recall and initiated a lawsuit against Gold Bond to recover its damages.

Westchester issued Gold Bond a comprehensive general liability policy providing primary coverage with liability limits of $1 million. U.S. Fire provided Gold Bond with a commercial umbrella policy of an additional $10 million dollars of liability coverage. Both Westchester and U.S. Fire rejected Gold Bond's tenders of defense.

---

[1] Gold Bond also produced for Carnation bite-sized frozen fruit and juice nuggets known as "Fruit Scoops" which were recalled.

Gold Bond then provided its own defense and eventually reached a settlement with Carnation on July 21, 1989. The settlement payment exceeded the combined policy limits of the U.S. Fire and Westchester policies and was made on August 24, 1989.

On August 25, 1989, both insurers brought this action for declaratory judgment seeking a declaration that neither had a duty to defend or indemnify Gold Bond in the federal action. Gold Bond counterclaimed for breach of contract requesting indemnification and the costs and expenses of defending the federal action, including reasonable attorney fees. The counterclaim did not state that Gold Bond's payment to Carnation exceeded the policy limits, nor did it state the cost of defending the California action.

Both sides brought summary judgment motions. The trial court determined that the insurers' declaratory judgment action was not timely and that they breached their duty to defend under the policy. However, the trial court limited the insurers' liability to the limits of each policy and denied Gold Bond's motion for prejudgment interest. Both sides appeal this judgment.

While preparing their appellate briefs, U.S. Fire and Westchester discovered that attachments to a letter not included in the record on appeal showed that although the stipulation ending the California action was signed on August 24, 1989, the order confirming such stipulation was not signed until September 21, 1989. Thus, the federal action was not completed when U.S. Fire and Westchester brought their declaratory action on August 25, 1989. On this basis, U.S. Fire and Westchester filed a sec. 806.07, Stats., motion for relief from the trial court's judgment.[2] The trial court again concluded that the

---

[2] U.S. Fire and Westchester first filed a motion to correct the record or, alternatively, to stay the appeal and remand the case to

insurers' action was too late and issued an order denying relief from the judgment and holding that the previous judgment remained in full force and effect. U.S. Fire and Westchester appealed that order and the two appeals were joined.

## ISSUES AND STANDARD OF REVIEW

The appellate issues are as follows:

I. Did U.S. Fire and Westchester have a duty to defend Gold Bond based on the insurance policies, in light of the following sub-issues?

    A. Is Carnation an insured under either of the policies?

    B. Was there an "occurrence" based on the allegations in the complaint?

    C. Does the "sistership" exclusion apply?

    D. Does the "business risk" exclusion apply?

    E. Does the "failure to perform" exclusion apply?

    F. Does the "cross-liability" exclusion in the U.S. Fire policy apply?

II. Was U.S. Fire and Westchesters' declaratory judgment action timely instituted?

III. Did the trial court properly exercise its discretion in denying U.S. Fire and Westchesters' motion for relief from judgment?

the trial court. The court of appeals denied this motion, stating that U.S. Fire and Westchester should file a motion with the trial court under sec. 806.07, Stats., for relief from the judgment in order to obtain review of the stipulation and order.

IV. Was Gold Bond entitled to recover the reasonable costs, including attorney fees, it incurred in defending the California lawsuit?

V. Was Gold Bond entitled to prejudgment interest at either 5% or 12% on the policy limits or on the attorney fees?

VI. Is Gold Bond entitled to recover the reasonable costs, including attorney fees, it incurred in establishing coverage in this action?

When we review a summary judgment, this court applies the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). If there is no genuine issue of material fact and one side is entitled to judgment as a matter of law, the action is appropriate for summary judgment. *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 978, 984, 473 N.W.2d 506, 508, 510 (Ct. App. 1991).

In return for premiums paid by the insured, U.S. Fire and Westchester assumed the contractual duties of indemnification and defense described in the policies. *See Elliott v. Donahue*, 169 Wis. 2d 310, 320, 485 N.W.2d 403, 407 (1992). An insurance carrier's duty to defend is broader than its duty of indemnification. *Id.* at 320-21, 485 N.W.2d at 407. If the insurance company refuses to defend, it does so at its own peril. *Id.* at 321, 485 N.W.2d at 407. When the insurer breaches its duty to defend its insured, it waives any later challenge regarding its duty to indemnify. *Professional Office Bldgs. v. Royal Indem. Co.*, 145 Wis. 2d 573, 584-85, 427 N.W.2d 427, 431 (Ct. App. 1988). As *Professional Office Bldgs.* notes, this harsh result can be avoided if the

insurer seeks a timely resolution of the coverage issue by a court, rather than determining coverage for itself by refusing to defend. *Id.* at 585, 427 N.W.2d at 431.

Interpretation of words or clauses in an insurance contract is a question of law. *Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 744, 456 N.W.2d 570, 572 (1990). Thus, the dispositive issue is one of law and, therefore, because there are no genuine issues of material fact, the case is properly decided on summary judgment.

## I. THE INSURERS' DUTY TO DEFEND

For there to be a duty to defend, there must be allegations in the complaint that, if proven, would fall within coverage (the duty to indemnify) afforded by the policies.[3] *Sola Basic Ind. v. USF&G Co.*, 90 Wis. 2d 641, 646, 280 N.W.2d 211, 213 (1979). In *Elliott*, 169 Wis. 2d at 317, 485 N.W.2d at 405-06, our supreme court

---

[3] In the complaint, Carnation sought recovery from Gold Bond for:

> all damages incurred as a result of the FDA recommended recalls, Carnation's initial limited withdrawal of Bon Bons, and Carnation's ultimate withdrawal of all Bon Bons and Fruit Scoops products. Such damages . . . consist of, but are not limited to, at least the following items: loss of inventory at distribution centers; reimbursement to customers and consumers; payments to suppliers for ingredients, packaging, and other materials; advertising and promotional costs; costs of finished product collection; and cost of disposal and storage of collected product.

The Westchester policy states that Westchester "shall have the right and duty to defend any suit against the insured seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . .." The U.S. Fire policy stated "We will defend any 'suit' seeking damages covered by this policy."

described the duties of the insurer when coverage is fairly debatable. While it stated that under the principles enunciated in *Mowry v. Badger State Mut. Cas. Co.*, 129 Wis. 2d 496, 516-17, 385 N.W.2d 171, 180-81 (1986), an insurer may reject the tender of defense when coverage issues are fairly debatable without breaching their duty to defend if the coverage determination precedes the underlying action, the *Elliott* court ruled that the insurer still must provide a defense to the insured in the underlying action if the underlying action comes before a coverage determination. *Elliott*, 169 Wis. 2d at 318, 485 N.W.2d at 406. In this case, although the underlying liability issue was tried before coverage was determined, U.S. Fire and Westchester did not defend Gold Bond. Therefore, if the coverage issue is fairly debatable, U.S. Fire and Westchester have breached their duty to defend.

Our review of the policy language, in light of the *Elliott* "fairly debatable" standard, is distinct from a review determining whether a duty to indemnify exists. We seek only to determine whether the existence of a duty to indemnify is fairly debatable.

Although the "fairly debatable" standard is measured from the insurers' point of view, the policy language is still tested not by what the insurer intended the words to mean, but by what a reasonable person in the position of the insured would have understood the words to mean. *Kozak v. USF&G Co.*, 120 Wis. 2d 462, 466-67, 355 N.W.2d 362, 364 (Ct. App. 1984). Likewise, where ambiguities exist, courts will construe the language against the drafter and in favor of the insured. *Schroeder v. Blue Cross & Blue Shield*, 153 Wis. 2d 165, 173, 450 N.W.2d 470, 473 (Ct. App. 1989). Thus when deciding whether there is a duty to defend, insurers and courts

must determine, in light of these construction rules favoring insureds, whether the particular coverage is fairly debatable.

A. Carnation Is Not an "Insured" Under Either of the Policies

An important step in determining whether the coverage issue is fairly debatable is deciding whether Carnation is an "insured" under either or both policies.[4] This is because the term "insured" appears in many of the policies' coverage definitions and exclusions. If Carnation is an "insured" for the purposes of policy definitions and exclusions, then the meaning of the exclusions, such as the cross-liability exclusion, which excludes coverage for one insured suing another, is vastly different than if Carnation is not an "insured" for the purpose of the coverage definitions and exclusions.

The Westchester policy states that " 'insured' means any person or organization qualifying as an insured in the 'Persons Insured' provision." The "Persons Insured" provision was amended to include "Carnation World Headquarters" as of June 3, 1987.[5] However, according to Carnation's complaint, the "occurrence" that triggered the recalls and all of Carnation's damages occurred on March 11, 1987, the date the contaminated

---

[4] There is no claim that Carnation is covered under the policies, rather the insurers contend that Carnation is an insured as that term is contemplated in several of the exclusions to Gold Bond's coverage.

[5] The "Persons Insured" provision was amended by adding "Carnation World Headquarters" to a Vendor's Endorsement (form FM.0.0.193). It was previously agreed to include all entities listed on such form FM.0.0.193 as "Persons Insured" subject to certain limitations.

product was manufactured. Thus, the amendment making Carnation an "insured" in the "Persons Insured" provision subject to certain limitations was not operative because it occurred after the "occurrence." *See Western Cas. & Sur. Co. v. Budrus,* 112 Wis. 2d 348, 352-53, 332 N.W.2d 837, 840 (Ct. App. 1983). Therefore, we need not determine whether the vendor's endorsement made Carnation an insured. Consequently, Carnation was not an "insured" under the plain language of the Westchester policy.

The U.S. Fire policy defines "Insured" as follows:

"Insured" means the "Named Insured" and

a. any person, organization, trustee or estate that has obligated you by written contract to provide the insurance that is afforded by this policy; but only with respect to duties performed by or for you, or to facilities owned or used by you;

b. at your option and subject to the terms of this policy, any additional "insured" included in the underlying policies, other than the "named insured,". . ..

Carnation is not the "Named Insured." By its plain language, clause b. is only effective if Gold Bond exercises an option and there is no evidence that it has done so. Therefore, clause b. does not make Carnation an "insured."

U.S. Fire contends however that clause a. makes Carnation an insured by virtue of a 1983 agreement between Carnation and Gold Bond. We disagree. That agreement states Gold Bond agrees to carry "Public Liability Insurance including Contractual Liability and Product Liability Coverage (with the Broad Form Vendor's Endorsement naming Carnation as an insured)"

with property damage limits of not less than $500,000. Gold Bond met this requirement by purchasing the $1 million Westchester policy. Second, the agreement also states, "you (Gold Bond) will carry an umbrella aggregate of Five Million Dollars." Gold Bond met this requirement by purchasing the $10 million U.S. Fire policy.

However, unlike the first requirement mandating that Gold Bond provide coverage to Carnation by naming them as an insured on the Broad Form Vendor's Endorsement, the second requirement did not obligate Gold Bond to provide coverage to Carnation, but merely obligated them to obtain an umbrella policy for themselves. As a result, the 1983 agreement did not obligate Gold Bond to provide the insurance afforded by the U.S. Fire policy, and Carnation is not an "insured" under the plain language of the U.S. Fire policy.

B. Initial Coverage: "Occurrence" and "Property Damage"

Both the Westchester and U.S. Fire policies promise coverage for "occurrences." The Westchester policy[6] defines occurrence as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or *property damage* neither expected nor intended from the standpoint of the insured.

> "Property damage" means (1) physical injury to or destruction of tangible property which occurs during

---

[6] The U.S. Fire policy defines occurrence and property damage in substantially the same way as Westchester.

the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period. (Emphasis added.)

The insurers claim the damages sought are not "property damage" and cite *Hamilton Die Cast, Inc. v. USF&G Co.*, 508 F.2d 417 (7th Cir. 1975), a case where the insured manufactured aluminum die cast tennis racket frames and was sued for damages similar to those Carnation asked for. The *Hamilton* court denied coverage, but our supreme court has rejected the *Hamilton* rationale. *Sola*, 90 Wis. 2d at 652-53, 280 N.W.2d at 216-17.

The damages alleged by Carnation were:

-Loss of Inventory at Distribution Centers

-Reimbursement to Customers and Consumers

-Payments to Suppliers for Ingredients, packaging and other materials

-Advertising and promotional costs

-Costs of finished product collection

-Storage of collected product

The loss of use of storage space caused by Carnation's collection of the recalled product is one example of a loss of use of tangible property that is property damage caused by an occurrence. Under the plain language of the policies, it is fairly debatable that some of these damages are either (1) physical damage to tangible property or (2) loss of use of tangible property. If some coverage exists, the insurer must defend the entire action, even though

certain allegations may fall outside the scope of coverage. *See Elliott v. Donahue,* 163 Wis. 2d 1059, 1065, 473 N.W.2d 155, 158 (Ct. App. 1991), *rev'd on other grounds,* 169 Wis. 2d 310, 485 N.W.2d 403 (1992).

### C. The "Sistership" Exclusion Does Not Apply

Both policies contain a "sistership" exclusion, which states that the insurance does not apply

> to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Although Gold Bond argues to the contrary, this exclusion, if applicable, would exclude all of the damages alleged by Carnation. No Wisconsin court has spoken on this exclusion. One line of persuasive authority holds that under the plain language of this exclusion, it applies to damages stemming from all recalls regardless of who initiated them. *See Commercial Union Assur. Co. v. Glass Lined Pipe Co.,* 372 So.2d 1305, 1309 (Ala. 1979). Another line of authority declares the exclusion ambiguous, construes the ambiguity in favor of the insured and concludes the "sistership" exclusion only applies to those recalls that are initiated by the insured. *See Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.,* 314 N.E.2d 37, 38 (N.Y. App. 1974); *Elco Ind. v. Liberty Mut. Ins. Co.,* 414 N.E.2d 41, 45 (Ill. App. 1980).

Whether policy language is ambiguous is a question of law, *Lechner v. Scharrer,* 145 Wis. 2d 667, 672, 429

N.W.2d 491, 494 (Ct. App. 1988), and an ambiguity exists when the language is reasonably susceptible to more than one construction from the viewpoint of the reasonable insured. *Northwestern Nat'l Ins. Co. v. Nemetz*, 135 Wis. 2d 245, 255, 400 N.W.2d 33, 37 (Ct. App. 1986). Given the economic and factual setting in which these policies were written, ordinary business persons applying for insurance and reading the "sistership" exclusion could reasonably have thought they were covered against precisely the damage claims now asserted. *See Lipton*, 314 N.E.2d at 39. Thus, the exclusion is reasonably susceptible to more than one meaning and thus is ambiguous.

The etymology and genesis of the "sistership" exclusion shows that the exclusions should apply only to recalls initiated by the insured. As explained in *Olympic S.S. Co. v. Centennial Ins. Co.*, 811 P.2d 673 (Wash. 1991), a case that followed the *Lipton* and *Elco* line,

> When a defect is suspected to be responsible for an aircraft accident, all other aircraft of that type are grounded pending investigation. The potential damages arising from the loss of use of the sisterships are enormous. The exclusion was originally designed to exclude coverage for damages arising from the defect, other than those arising from the defect in the aircraft that was involved in the accident.

*Id.* at 676 (quoting *Charles E. Brohawn & Bros. v. Employers Comm'l Union Ins. Co.*, 409 A.2d 1055, 1057 n.3 (Del. 1979)). This history shows that the "sistership" exclusion was meant to apply only to recalls initiated by the insured. Moreover, ambiguous insurance policies must be construed against the insurer. *Berg v. Fall*, 138 Wis. 2d 115, 120, 405 N.W.2d 701, 703 (Ct. App. 1987).

Thus, we conclude that the "sistership" exclusion applies only when a recall is initiated by the insured.[7]

D. The "Business Risk" Exclusion

Both policies exclude coverage "to property damage to the named insured's products arising out of such products or any part of such products." Moreover, both define "named insured's products" as "*including any container thereof.*" (Emphasis added.)

Despite Gold Bond's argument to the contrary, the plain language of the "business risk" exclusion applies to the frozen treats themselves as well as their packaging. Arguably, this could exclude from coverage many of Carnation's claims. However, some claims listed as damages alleged by Carnation, such as those for advertising and promotional costs and the costs of collecting and storing the recalled material, are not damages to the named insured's products. Therefore, they would not be excluded from coverage under the "business risk" exclusion.[8] *See Elliott,* 169 Wis. 2d at 318, 485 N.W.2d at 406.

---

[7] Westchester argues that because Carnation is listed as an insured on the endorsement to its policy, the "sistership" exclusion should apply to exclude coverage even under this rationale because an insured, Carnation, initiated the recall. Because we have determined that Carnation is not an "insured" under either policy, we reject this argument.

[8] This case is distinct from *Holsum Foods v. Home Ins. Co.,* 162 Wis. 2d 563, 469 N.W.2d 918 (Ct. App. 1991), where we held the "business risk" exclusion did not exclude coverage for a sauce packaging company's payments to the owner of the sauce, after an error in the packaging to caused a large portion of the sauce to be rendered unmarketable. In *Holsum,* there was no underlying litigation that an insurer failed to defend. Therefore, the dispositive issue was whether the sauce was the insured's product. *Id.* at 568,

## E. The "Failure to Perform" Exclusion

The Westchester policy[9] excludes coverage

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
. . ..

> (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

But *this exclusion does not apply to loss of use of other tangible property* resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured *after such products or work have been put to use* by any person or organization other than the insured.

---

469 N.W.2d at 920. In our case, the dispositive issue involves the allegations of Carnation's complaint. Carnation's complaint alleged not only damage to the Bon-Bons, regardless of whose "product" they are, but also the loss of advertising and promotional costs associated with products that never went to market and pickup and storage costs of the damaged products. Consequently, the "business risk" exclusion does not remove the issue of Carnation's duty to indemnify from the realm of the "fairly debatable."

[9] The U.S. Fire exclusion is substantially similar, but its exception to the exclusion differs in that it says:

But this exclusion does not apply to:
(2) Loss of use of other tangible property resulting from sudden or accidental physical injury to or destruction of your product or work performed by or for you, if the loss occurs after your product or work has been put to use by anyone other than an "insured."

The "failure to perform" exclusion does not apply to losses of use resulting from "sudden and accidental physical injury to or destruction of your product" when the loss occurs after the product has been put to use by someone other than the insured.[10]

The exception to the exclusion shows that this instance is excepted from the exclusion. The Bon-Bons were suddenly and accidentally physically injured and destroyed when they were contaminated by the bacteria. This injury caused a loss that occurred after the product had been put to use by someone other than Gold Bond. For example, after Gold Bond's products (the Bon-Bons) were put to use by Carnation, as a result of a sudden and accidental physical injury to Gold Bond's products, Carnation lost the use of its vehicles and storage space when the recall occurred. The exception to the exclusion requires that the loss occur after the Bon-Bons were put to use by Carnation, but not that physical injury occur after that time. Therefore, the "failure to perform" exclusion does not apply.

F. The U.S. Fire "Cross-Liability" Exclusion

The U.S. Fire policy contains an exclusion that does not appear in the Westchester policy. This exclusion states "This policy does not apply to claims brought by one insured covered in this policy against another insured covered in this policy."

---

[10] Although there could be some debate about whether under the Westchester policy *the loss or the injury* needs to occur after the product has been put to use by others for the exception to apply, the Westchester language is a classic ambiguity that should be construed in favor of the insured. *See Berg*, 138 Wis. 2d at 120, 405 N.W.2d at 703.

The applicability of the cross-liability exclusion depends on Carnation being an "insured" under the U.S. Fire policy. Because we have concluded that Carnation is not an insured under either policy, the cross-liability exclusion is not applicable.

Because the "sistership," "failure to perform" and "cross-liability" exclusions do not apply, and because the "business risk" exclusion does not eliminate from coverage all of the damages alleged by Carnation in the federal lawsuit, the question of coverage is fairly debatable. If some coverage exists, the insurer must defend the entire action, even though certain allegations may fall outside the scope of coverage. *See Elliott*, 163 Wis. 2d at 1065, 473 N.W.2d at 158. Because the coverage question is fairly debatable and the coverage issues were not decided prior to the underlying liability issues, the insurers had a duty to defend Gold Bond in the federal lawsuit. Because they did not, they breached their duty to defend. *Elliott,* 169 Wis. 2d at 321, 485 N.W.2d at 407. Therefore, they are liable to Gold Bond for the full value of their policy indemnification limits. *See  Professional Office Bldgs.,* 145 Wis. 2d at 584-85, 427 N.W.2d at 431.

## II. THE INSURERS' DECLARATORY ACTION WAS NOT TIMELY

Both U.S. Fire and Westchester expressly denied they had a duty to defend Gold Bond. Their declaratory action was to determine their duty of indemnification and their duty to defend. However, once an insurer wrongly refuses to defend, its duty of indemnification is no longer relevant. *Id.* The relevant issue is the insurers' duty to defend. The circuit court ruled:

In the principal action almost two years passed from the tender of defense to the settlement of the case. There was ample time for the plaintiffs to litigate the coverage question if they wished. Once the case was complete, they were faced with the question of whether they had breached the contractual duty to defend. The declaratory judgment action does not address that question, only the counter-claim does.

U.S. Fire and Westchester erroneously contend that the circuit court ruled that it could not bring a declaratory judgment action construing the insurance contract. The court, however, ruled not that its declaratory action was barred, but rather that the portion of it that dealt with the insurers' duty to indemnify was now irrelevant. To the extent that the declaratory judgment addressed the duty to defend, these arguments were determined under Gold Bond's counterclaim and motion for summary judgment. The trial court's ruling with regard to the insurers' declaratory judgment motion was correct.

## III. THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION BY DENYING THE INSURERS' MOTION FOR RELIEF FROM JUDGMENT

U.S. Fire and Westchesters' motion for relief from judgment is decided on the same grounds as the trial court decision to dismiss the declaratory judgment action. The entire motion is based on the fact that U.S. Fire and Westchester brought their declaratory judgment action before the federal judge in California had signed the stipulation and order for dismissal of the federal action. However, whether the federal action was completed is not relevant. Once the insurer wrongfully declines the tender of defense, it has breached its duty to

defend, and the duty of indemnification is irrelevant. *Professional Office Bldgs.*, 145 Wis. 2d at 584-85, 427 N.W.2d at 431. The trial court correctly denied U.S. Fire and Westchesters' motion for relief from judgment.

## IV. ATTORNEY FEES IN THE UNDERLYING ACTION

The trial court ruled that the insurers were liable to Gold Bond for the amount of the settlement, the cost of defending the lawsuit and any additional damages, but limited the insurers' liability to their policy limits.

Recently in *Newhouse v. Citizens Secur. Mut. Ins. Co.*, 170 Wis. 2d 456, 489 N.W.2d 639 (Ct. App. 1992), we held that in this instance "the measure of damages is the policy limits plus interest and costs, including attorney fees." *Id.* at 469, 489 N.W.2d at 644. This rationale is consistent with the well-known doctrine that an insurer owes its insured both a duty to indemnify, to which the policy limits apply, and a duty to defend, which is separate from and in addition to the duty to indemnify. Where an insurer breaches its duty to defend and the insured is forced to litigate the action at its own expense, the insurer is liable to the insured for the cost of the litigation. *See Elliott*, 169 Wis. 2d at 320-21, 485 N.W.2d at 407. Under this rationale, the insurers are liable for the policy limits plus the reasonable attorney fees and other costs incurred by Gold Bond in the underlying California action.

## V. PREJUDGMENT INTEREST

Gold Bond asserts that it is entitled to interest on the policy limits and the fees incurred in the underlying action through either Wisconsin common-law at 5% (the legal rate) because the claim was readily determinable, or

through sec. 628.46, Stats., at 12%. The trial court denied prejudgment interest.[11]

## A. 5% Interest Via Common-Law

Under Wisconsin common-law, prejudgment interest at the legal rate of 5% is recoverable when there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he owes. *Olguin v. Allstate Ins. Co.*, 71 Wis. 2d 160, 168, 237 N.W.2d 694, 698 (1976). Stated otherwise, prejudgment interest should be awarded where the amount owed is readily determinable. *Id.*

We do not look to the merits of the insurers' argument on coverage in determining whether interest is appropriate. The question is whether the amount of the claim is determinable, not whether the cause of action is disputed. *Little v. Roundy's Inc.*, 152 Wis. 2d 715, 723, 449 N.W.2d 78, 82 (Ct. App. 1989). A dispute as to liability has never been recognized as a bar to the payment of interest. *Nelson v. Travelers Ins. Co.*, 102 Wis. 2d 159, 170, 306 N.W.2d 71, 77 (1981).

In *Nicholson v. Home Ins. Cos.*, 137 Wis. 2d 581, 608, 405 N.W.2d 327, 338 (1987), our supreme court refused to award prejudgment interest in a case where the damages' determinability was based on an insurance

---

[11] When a case does not go to a jury, interest accruing from the time a claim is made is referred to as prejudgment interest. When a case does go to a jury, sec. 814.04(4), Stats., provides 12% interest from the time of the verdict until judgment is entered. In this instance, in order to avoid confusion with sec. 814.04(4) interest, interest accruing from the time the claim is made is referred to as pre-verdict interest. *See Johnson v. Pearson Agri-Systems, Inc.*, 119 Wis. 2d 766, 768 n.1, 350 N.W.2d 127, 129 n.1 (1984).

policy's limits. The *Nicholson* court relied on the *Johnson* rule, 119 Wis. 2d at 781, 350 N.W.2d at 135, that claims for unliquidated amounts may not be the subject of prejudgment interest and declined the opportunity to modify this rule where policy limits are either exceeded by a verdict or it is reasonably likely that damages will exceed the policy limits. In *Nicholson*, the court rejected the plaintiff's plea to "treat the plaintiff's case as a claim against [the insurer] for its maximum potential liability under its policy rather than as a typical personal injury claim." *Id.* at 608, 405 N.W.2d at 338. *Nicholson* and *Johnson* were typical personal injury cases. The instant action, conversely, is precisely the type of claim *Nicholson* was not. It is a claim against the insurer for its maximum potential liability, a contract claim for a determinable amount. Gold Bond claims that U.S. Fire and Westchester have breached their contractual duty to defend, causing a determinable amount of damage.

Liquidable damages for breach of contract bear interest from the time of demand. *Waukesha Concrete Products v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 340, 379 N.W.2d 333, 336 (Ct. App. 1985). Gold Bond's first demand came with the filing of their counterclaim. Therefore, 5% interest is awarded from that date.

Gold Bond also claims 5% interest on the federal action attorney fees and costs. The attorney fees and costs became determinable as soon as they were incurred by Gold Bond. All fees and costs were incurred by the time Gold Bond paid Carnation. The insurers argue they should not have to pay interest because Gold Bond never told them the amount of the fees and costs. However, because the burden of making the determination of the

amount owed is on the party withholding payment, *Klug & Smith Co. v. Sommer,* 83 Wis. 2d 378, 384-85, 265 N.W.2d 269, 272 (1978), Gold Bond had no obligation to inform the insurers of the amount of the attorney fees. The counterclaim alleging a breach of the duty to defend amounts to Gold Bond's first demand for attorney fees and costs incurred, and 5% interest is awarded from that date.

### B. 12% Interest Via Section 628.46, Stats.

Section 628.46, Stats., provides for interest at 12% on insurance claims from thirty days after "the insurer is furnished with written notice of the fact of a covered loss and of the amount of the loss." However, the section also states that interest will not accrue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment.

Thus, the critical issue in assessing 12% interest is whether the insurers had reasonable proof establishing that they were not responsible for the payment. *Poling v. Wisconsin Physicians Serv.,* 120 Wis. 2d 603, 612-13, 357 N.W.2d 293, 298-99 (Ct. App. 1984); *Upthegrove Hardware, Inc. v. Pennsylvania Lumbermans Mut. Ins. Co.,* 146 Wis. 2d 470, 484-85, 431 N.W.2d 689, 695-96 (Ct. App. 1988). We recently held in *Fritsche v. Ford Motor Co.,* 171 Wis. 2d 280, 491 N.W.2d 119 (1992), that where the trial court had not decided whether the insurer had reasonable proof, we were precluded by the Wisconsin Constitution from making this factual determination. *Id.* at 306, 491 N.W.2d at 129. In this case, the trial court commented that "the issues in this case are complex. No Wisconsin law exists on many of the points in controversy, and the plaintiffs had a right to litigate this matter without facing prejudgment inter-

est." This amounts to a holding that the insurers had reasonable proof that they were not responsible. We agree and deny 12% interest on any claim. This is also consistent with our holding that the coverage issue was fairly debatable.

## VI. GOLD BOND IS ENTITLED TO ATTORNEY FEES INCURRED IN PROVING COVERAGE

While this case has been on appeal, the supreme court issued its decision in *Elliott,* 169 Wis. 2d 310, 485 N.W.2d 403 (1992), and ruled that an insured may collect attorney fees and costs expended in successfully proving coverage.

The insurers claim that this issue is not properly before the court because it was not ruled on by the trial court. Gold Bond argues that the trial court should be allowed to consider this issue on remand. While generally issues not raised or considered in the trial court will not be considered for the first time on appeal, this rule is one of administration and does not involve the court's power to address the issues raised. *Wirth v. Ehly,* 93 Wis. 2d 433, 443-44, 287 N.W.2d 140, 145-46 (1980). We may choose to consider an issue if a recent decision has clarified an area of the law, but was unavailable at the time the trial court issued its decision. *Winkel v. PCA,* 153 Wis. 2d 550, 557, 451 N.W.2d 440, 443 (Ct. App. 1989). Here, we choose to consider this issue and, under *Elliott,* Gold Bond may collect all costs, including reasonable attorney fees, incurred in proving coverage.

We remand this case to the trial court for a determination of the attorney fees and interest.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions. Costs are awarded to Good Humor.